May it please the court. Counsel, my name is Mark Echohawk. I represent the appellant, Mr. Kenneth Dirk Madsen, in a sufficiency of the evidence appeal from his conviction for the possession of illicit chemical. Mr. Madsen's appeal focuses on the application of an evidentiary standard this court established in a 2006 case, U.S. v. Ching Tang Lo. On a very basic level, this appeal calls upon the court to decide whether that evidentiary standard is satisfied by less evidence than was required in the U.S. v. Lo case. Mr. Madsen's position is that he was improperly convicted because there was insufficient evidence upon which a jury could base a finding beyond a reasonable doubt that the listed chemical iodine that was contained in the commingled tincture solution he possessed maintained its own distinct chemical identity as part of that commingled substance. The foundation for Mr. Madsen's position rests on the fact that this court, that Congress did not criminalize the possession of all materials that are important to the manufacture of a controlled substance. The material must be one of the identified listed chemicals. Now, Mr. Madsen didn't possess iodine in his pure form but in a tincture solution, and to address those cases, this court crafted a very specific evidentiary standard in the Lo case, which is that in order for a chemical to be considered, that is commingled with other chemicals for purposes of 841C, the chemical must maintain its distinct chemical identity as part of the commingled solution and not change into another chemical. There's a second prong to that test which is not at issue in this case. That's a clear standard for Mr. Madsen's position, one that could have easily been satisfied at trial had the government asked a simple and direct question of the expert, does the iodine that is contained in the commingled substance maintain its distinct chemical identity despite being part of that commingled substance? That type of direct evidence didn't exist in this case. Well, I guess that, go ahead. Excuse me, go ahead. No, please. Doesn't the testimony of the expert meet that test when he says the iodine could be extracted from this solution? Isn't that saying the same thing? In part, yes, Your Honor. There is some evidence in this case about the nature of iodine as part of a tincture solution. Indeed, the government's expert, Mr. Wyckoff, did testify at one point that 7% of the tincture solution is iodine. Mr. Madsen's position is not that. There is no evidence that gets to that point. It's just that there is insufficient and a lack of direct evidence. Why else should the government allow iodine? What's missing? What's missing is set out in the low case, and the absence of evidence here is apparent when you compare the two. In the low case, there was a field test on the extract that Mr. Lowe possessed, and it tested positive for ephedrine, the illicit chemical. There was, and that's the first thing. The second is that an expert in that case actually performed a high-performance liquid chromatography test, which quantified the pure amount of ephedrine in the Ma Huang extract. What would be the, it seems a little bit different here because we don't have this sort of unknown substance, the Ma Huang. We have this tincture, which on its label says 7% is iodine. Why isn't that the same as somebody taking Ma Huang and testing it, and then what the expert there said is that it contained ephedrine? Wouldn't that be equivalent in terms of the evidence of actually having the substance there as opposed to just some ingredient? Yes and no, Your Honor. I agree that the label provides some evidence about what's in that commingled solution. I don't think it's the same type of evidence that was presented to the jury in the Madsen case. And as far as the label goes, it has more information than just that iodine is contained in the commingled solution. It also indicates that there was potassium iodine and isopropyl alcohol, and I think the jury reasonably could have questioned whether something happened to the iodine that's part of that commingled solution. So what, at the end of the day, would we need? Do you think that Lowe establishes a rule that you need testing? What would, kind of following on Judge Forza, what would be the additional evidence in your view that would bring it over the sufficiency hurdle? A direct question and an answer from an expert that says the chemical that is listed does not have any change in properties, that it maintains its distinct chemical identity. The references we have are, I think, out of context, and if you consider the two, I think there are really two references in this record to the nature of the iodine. One in the record at 19 about the 7% being iodine, and that was in response to a question about the amount of grams contained in these four bottles. It was qualified by his statement that if you were to dry it out or analyze it or whatever, you could get iodine. At one point, he indicates also that you could add the iodine right in, but that, considering context, does not speak to the chemical identity of that iodine. It's in response to some questions about whether you can add heat, a fuel additive, directly into the process, and the government's expert said no. Can you add the matches right in? The government's expert said no. Can you add iodine right in? The government's expert said you can, but what you usually try to do is precipitate it out prior to adding it in. Those responses, when taken in context, are not the same type of evidence that existed in the Lowe case. Does Lowe set, like, the minimum standard or the bar? I mean, the question is sufficiency of evidence, and I take it, or I guess I should clarify this. Lowe recites that in that case, the defendant did not try to put on an expert to say something to the contrary. Was there anything offered by either of the defendants in this trial that the iodine did not maintain its separate identity here? No, Your Honor. So basically, you've got nothing on the side of the defense, and the question is, how much do you need on the side of the prosecution to satisfy the sufficiency of evidence standard? And I don't read Lowe to say, this is the absolute minimum. Anything less than was offered up in this case wouldn't be enough. I read Lowe to say, this was the evidence here. It was enough. Well, the question we now have, it may be more, it may be less than was the situation in Lowe, but is the evidence in this case sufficient? And in a case where the defendant's plural haven't presented anything on that subject, how much does it really take to get over that bar? Your Honor, because I believe that the Lowe case does establish a minimum standard. The defendant doesn't have a burden similar to the government's burden in this case, and they have a very specific burden for a good reason. Because they're proving that he possessed an illicit chemical which was not actually illicit chemical. They're proving it by the fact that he possessed a precursor to illicit chemical. In that type of case, it's good policy, and I think it's the law in the Lowe case, that the government has a heightened and specific burden, something that the defendant does not have to come in first to present evidence to the contrary. So what in the case Lowe leads you to believe that sets an absolute minimum bar? It can be no less than the evidence submitted in the Lowe case? There is no direct language that says that is a minimum. Based on the history behind the Lowe case, there's I think only one other case prior to Lowe in the Ninth Circuit, U.S. versus Dawes, that talks about this issue. Lowe looked at that case and refined the test, and I think the best way to answer that would be to consider what the Lowe case would have decided. How that would have come down absent the field test, HPLC test, the actual extraction conducted by the expert, the DEA agent that testified about the content of the extract and Lowe's expert as well that had done a chemical assay doing a quantitative or a qualitative analysis. Absent those things, I think the Lowe case would have turned out different, and for that I think it, because of that, I think it establishes a minimum which this Court should follow. It's not a hard test to hold the government to, and where they're trying to prove possession by possession of a commingled substance, it's good policy and consistent with standards of due process to require them to have a heightened and specific burden. Thank you. We've got a second defendant. Are we going to have an additional argument? You just used up your 10 minutes. Do you have something specific for your client that would be different? Yes, you may. Next time you might want to allocate your time in advance. Thank you, Your Honor. I appreciate that. Just I'd like to incorporate the arguments for counsel. And we obviously will include a briefing and an argument. Thank you. And so there's two issues in my case, essentially. One is the tincture solution, and one is the ineffective assistance of counsel. And so in regards to the tincture solution, I would just like to argue that the standard in Lowe is a sufficiency of the evidence, and I don't think it was met in this case, mainly because you have an expert who used a generality that tincture solution can be precipitated out. But there's no evidence that that solution that isn't evidenced to be precipitated out in iodine in that solution maintained its character. And I think that's a point. I wasn't trial counsel. I'm appellate counsel, so it's a little different. I'm able to review the record and look at it just in a different light. But to me, as a trial litigator, that there was no evidence that that solution, when it was mixed, because the ingredients on the back of the bottle says it was mixed with these different solutions, but there's no testimony that shows that that specific solution maintained its integrity. Just a generality from the expert that says, well, tincture solution can be precipitated out. And I think it's a big point, and so I just make sure the court will take a look at it. And in that sense, there's no specific test on those solutions that they maintained their specific character. And I see my time's up, but thank you. OK, thank you. May it please the court and counsel, I am Michelle Mallard, Assistant U.S. Attorney for the District of Idaho. And I was trial counsel. Lots of Pocatello people today. Did you all come over together? No, but we're having a good time together. And I was trial counsel on this case as well. The crux of this case is whether, when viewing the evidence in the light most favorable to the government, was there sufficient evidence to find that the iodine within the iodine tincture maintained its distinct chemical identity. And I would first point the court to the Dawes case. And in that case, which is much more similar in evidence than to our case, than the Lowe cases, you had packaged goods containing ephedrine and pseudephedrine. And the only evidence cited by the court in that case was the defendant's own expert witness who said that the products sold in the store, in packaging, were mixtures containing extractable ephedrine and pseudephedrine. Therefore, the court said, plainly, they were listed chemicals within the meaning of 841D2. In our case, we have a government expert witness saying the same thing. In fact, if you take Mr. Echohawk's question that he would have liked the government to ask, does this tincture maintain its distinct chemical identity as iodine? If you take that question and put it in front of Mr. Wyckoff's testimony on page 49 of the excerpts of record of Mr. Madsen, the answer makes almost perfect sense. It's 7% of iodine, Mr. Wyckoff answers. There's another question. He said, is it tinctured iodine? Well, that's what it means. It means that that volume, weight to volume, or volume to volume mixture, 7% of that container, if you were to dry it out or analyze it, or whatever, would be iodine. If you were to put hydrogen peroxide in it, no, 7% of that solution right there is iodine. And then he goes on to say that tincture means solution. So in this case, I think a big distinction is the difference between packaged goods purchased in a store with a label and an extract oil in barrels with no label. In this case specifically, I mean, the police watched Mr. Madsen buy these things. They had two witnesses, a clerk at each store who testified that Mr. Madsen bought the iodine, asked for gallons of iodine. And after the first store, they notified the sheriff. The sheriff watched Mr. Madsen go into the veterinary clinic, the second store, with Mr. Nelson parked out of sight of the window of the veterinary clinic and watched as Mr. Madsen came out with the iodine. What the defense is suggesting is that Lowe's holding is not that a mixture needs to maintain its distinct chemical identity. What they're saying is that the Lowe's holding is that all mixtures must be tested. And that's just not the holding of Lowe. All mixtures do not have to be tested. That was the evidence in Lowe. But the substance there was quite different than what we have in this case, which is packaged iodine, labeled, purchased from stores, and immediately retrieved. In Lowe, it was Mah-Huang extract in barrels, unlabeled, a natural substance that scientists testified had ephedrine in it. But certainly there were no labels or any other evidence on the packaging that that's what it was. I guess in some sense, the question is, you're dealing with lawyers, judges, we're not chemists, we're all trying to reach back to high school and college and figure out what's necessary to put in front of the jury. It sounds like the real challenge is whether there was testimony or evidence in some form that said there is iodine in an unchanged form. That is, my basic chemistry, there's not a compound, there's a mixture. It's not just potassium iodine, for example, where the iodine has changed form. It is pure iodine in this solution. Now, you can infer that, I suppose, from the testimony. But was there ever specific testimony to that effect? Well, there was not a specific question. But as I stated previously, I think that there was specific information when the government's 7% of that solution right there is iodine. He didn't say it was tincture of iodine. He didn't say it was iodine potassium. Oh, and he distinguished it. I wouldn't tell you whether you could extract it out, though, correct? That's right. But he did testify in his testimony, he said that it was easily extractable. And not only that it was extractable, but that the tincture itself could be poured right in and used to make methamphetamine. Now, I realize that the statute requires that they possess iodine, not tincture of iodine. But I think his testimony in that regard, that it can be either extracted or poured right in, goes to show that it certainly did maintain its identity as iodine, as well as its utility. I don't see this case as so unlike a historical meth case, where the evidence is presented through testimony that methamphetamine was purchased. No testing is done in those cases. The jury is required or allowed to accept the testimony of witnesses that it was methamphetamine that was purchased. And those cases are established by testimony, not by tests, not by field tests, not by tests of DEA chemists, but by the testimony of witnesses. And in this case, you had not only the testimony of the chemist that this was iodine that was easily extractable, that this itself was 7% iodine, not some other solution. You had the defendant, Mr. Madsen, referring to it as iodine. You had the defendant, Mr. Nelson, referring to it as iodine. You had the sheriff referring to it as iodine. And the defendants both referred to it as iodine before we got to trial. But at trial, both the defendant, both the defendants, the sheriff, the clerk at the feed store, the clerk at the vet clinic, the product label, everyone referred to this as iodine, not tincture of iodine. There was never an objection to that during the entire course of the trial. And that was pointed out in the low case as well, that during the course of trial, the defense never objected to the fact or never brought up the fact that the ma huang extract did not have a distinct chemical identity. That's not a holding, but the court saw fit to, this court saw fit to mention it as a factor in their decision in Lowe that, and as you recall, Lowe overturned the district court's decision to take away the verdict, and the Ninth Circuit reinstated the verdict and said, no, the government did prove that it maintained its distinct identity. And I think that's all I have for the court. Unless you have some more questions. Thank you. You may have one minute for rebuttal between the two of you if you want, one of you want to respond to the government. Just in rebuttal, I'd just like to say that in this case, I made this point before, I think that the sufficiency of the evidence standard at this point had to have some type of evidence that those bottles maintained their separate chemical identity. I understand that the chemist in this matter testified that those bottles, I don't know if exactly those bottles right there, I remember him saying that the tincture of iodine could be precipitated out. However, if you're going to prove a case of being reasonable doubt, people's lives go to prison, how do we know those bottles and then themselves without a chemical test maintain their separate chemical identity? Thank you. I appreciate your arguments this morning. The case of the United States versus Madsen and Nelson is submitted. And the last case for argument this morning that we have is the United States versus Brown.
judges: McKeown, Clifton, Schwarzer